Peter J. **BRENNAN**, Secretary of Labor, United States Department of Labor, Plaintiff-Appellant,

v.

**TAFT BROADCASTING COMPANY,** Defendant-Appellee.

No. 73-3760.

United States Court of Appeals, Fifth Circuit.

Sept. 9, 1974.

William J. Kilberg, Sol. of Labor, U. S. Dept. of Labor, Washington, D. C., Beverely R. Worrell, Reg. Sol., U. S. Dept. of Labor, Norman H. Winston, Assoc. Reg. Sol., George D. Palmer, Atty., Birmingham, Ala., Carin Ann Clauss, U. S. Dept. of Labor, Donald S. Shire, Washington, D. C., for plaintiff-appellant.

James E. Simpson, Birmingham, Ala., for defendant-appellee.

Before TUTTLE, COLEMAN and AINSWORTH, Circuit Judges.

COLEMAN, Circuit Judge.

This is an action for damages and to enjoin an alleged violation of the Age Discrimination in Employment Act of 1967 (29 U.S.C. § 621 et seq.) which provides in part:

" § 623(a) It shall be unlawful for an employer—

(1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age; . . . ."

The Secretary of Labor alleges that defendant Taft Broadcasting Company violated the above quoted section of the Act by compelling Rufus Jones to retire at age 60 and by thereafter refusing to rehire him.

The defense is that Taft's discharge of Jones is allowed under 29 U.S.C. § 623(f)(2) which provides:

" § 623(f) It shall not be unlawful for an employer, employment agency, or labor organization—

. . . (2) to observe the terms of a bona fide seniority system or any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this chapter, except that no such employee benefit plan shall excuse the failure to hire any individual; . . . ."

The District Court dismissed the action on the ground that defendant came within the statutory exception of 29 U. S.C. § 623(f)(2) in that its Profit-Sharing Retirement Plan [hereinafter the Plan] is a "bona fide employee benefit plan, such as a retirement plan, which is not a subterfuge to avoid the purposes of this [Act]".

We affirm.

## FACTS

The facts were stipulated.

Taft bought WBRC–TV in Birmingham, Alabama, in 1957 and continued the employment of Rufus Jones (age 47) who for six years had been an employee there. In 1963 employees of WBRC–TV became eligible, at their option, to participate in Taft's "Profit Sharing Retirement Plan". On March 28, 1963, at the urging of Taft and on the basis of a summary of the "Plan" posted at WBRC–TV, Jones elected to participate.

In 1968 and again in 1969, the President of Taft advised Jones that under its "Plan" he was obliged to retire on 1 June 1970, at which time he would be sixty years of age. In response, Jones offered to waive his benefits in the "Plan" in return for a later retirement. He also contacted representatives of his union who urged Taft to continue Jones' employment.

On April 27, 1970, Taft's Board of Directors, responding to a letter to Taft's President from Jones, considered his case and decided not to permit him to work beyond age 60. Pursuant to applicable provisions of the "Plan", his employment was terminated as scheduled.

The previous month, Jones had filed a "grievance" as allowed by the terms of the collective bargaining agreement between his union and Taft. The arbitrator, concerning himself "solely with contractual rights of the Grievant" and not dealing with the terms of the "Act", found that there "has been no violation of the Grievant's rights".

Taft's "Profit Sharing Retirement Plan" is funded exclusively through company profits. Ten percent of profits, minus certain specified deductions, are paid to a trustee who distributes these funds to plan members upon their retirement.

The amount an employee receives upon retirement is determined by the number of "units" he earns while working for the company. At the end of each fiscal year, a Plan member is assigned "units" based upon his salary during the year, the length of his service in the company, and his age. Significantly, no additional units on the basis of age or on the basis of continuing service are assigned to persons over 60 years of age. The amount set aside for an employee each year is determined by multiplying the number of his "units" by the value of each unit. The value of each unit is the total contributions to the plan divided by the total number of units. Thus, the formula to determine the amount set aside for each year for an employee is:

$$\text{Number of his Units} \times \frac{\text{Total Contributions}}{\substack{\text{Number of Units of All} \\ \text{Participants.}}}$$

The sense of the retirement provisions of the "Plan" is that employees must retire at age 60 absent consent of the company to work until a later date. Additionally, Taft may retire employees for cause any time after their 50th birthday. The precise language used in the "Plan" is as follows:

Section 5.1.   Retirement Under Plan

"5.1(a) Normal Retirement.   The normal retirement date for each Participant shall be the first day of June coinciding with or next following the date on which he has attained age 60. A Participant terminating his employment on his normal retirement date shall be retired under the Plan as of such date.

"5.1(b) Later Retirement.   A Participant, with the approval of the Company, may remain an Employee after his normal retirement date. In such event, he shall be retired under the Plan as of his later date of termination of employment.

"5.1(c) Early Retirement. A Participant whose employment with all Employers terminates for any cause (including a failure to return prior to expiration of a leave of absence) on or after his 50th birthday, but prior to his normal retirement date, shall be retired under the Plan as of the date of such termination of employment or earlier commencement of such leave of absence."

Jones had not seen the actual text of the "Plan" when he assented to membership in 1963 but joined on the basis of a posted summary of the "Plan" which stated only the following provision relating to retirement:

"The Normal retirement date of each Participant is the June 1 on which he has reached age 60. A Participant retiring from employment with the company on his normal retirement date is deemed retired under the Plan as of such date."

The summary also contained the following provision on the assignment of profit-sharing "units":

"One unit for each full month that such Participant's age as of the end of such fiscal year exceeds age 35 but not age 60, provided *that no units shall be assigned for age under this clause to any Participant who is over age 60 as of the end of such fiscal year.*" [Emphasis supplied.]

## THE ISSUES

The Secretary-Appellant defines the issues as follows:

I. The lower court erred in holding that the exception provided in Section 4(f)(2) of the Age Discrimination in Employment Act excused defendant's *action in forcing the re*tirement of its 60-year old technical supervisor;

A. Defendant's "Profit Sharing Retirement Plan" is not a plan "such as a retirement, pension, or insurance plan" and thus does not come within the terms or purposes of the Section 4(f)(2) exception;

B. Even if defendant's "profit sharing retirement plan" could qualify as a type of plan contemplated by Section 4(f)(2), it is not bona fide since one of its "salient provisions"—the compulsory retirement feature—was not communicated to the participating employees at WBRC;

II. The lower court erred in holding that defendant was under no statutory obligation to consider Jones' application for reemployment by reason of the proviso in Section 4(f)(2) "that no employee benefit plan shall excuse the failure to hire any individual".

We shall discuss these issues in the order presented.

■ Does the defendant-appellee's "Plan" come within the terms and purposes of the Section 4(f)(2) exception?

We respond in the affirmative.

Taft's "Plan" was instituted in 1963. Jones exercised his option to participate in 1963. The Act was approved December 15, 1967. Quite obviously, Congress sought to avoid legal and constitutional problems likely to arise from any ex post facto effort to invalidate existing employee benefit plans. Consequently, it included the Section 4(f)(2) exception.

Its language is plain: "a bona fide *employee benefit plan such as* a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this chapter [emphasis ours]". The key phrase is "employee benefit plan". The words, "retirement, pension, or insurance", are added in a clearly descriptive sense, not excluding other kinds of employee benefit plans if, conceivably, there could be any.

Taft's "Plan" was effectuated far in advance of the enactment of the law, eliminating any notion that it was adopted as a subterfuge for evasion.

In construing the exception, as written, we must obey the mandate of the Supreme Court in Labor Relations

Board v. Highland Park Mfg. Co., 341 U.S. 322, 71 S.Ct. 758, 95 L.Ed. 969 (1951). In *Highland* it was claimed that the term "national or international labor organization" as used in the National Labor Relations Act is a technical one, meaning "union", thereby excluding the CIO, which was "a federation". The Supreme Court summarily rejected this argument, saying that if Congress meant terms in a statute to have other than their ordinarily accepted meaning, "it would and should have given them a special meaning by definition".

■ Contrary to these teachings, one matter heavily emphasized by the Secretary is an Internal Revenue Service Bulletin [Guides for Qualifications of Pension, Profit-Sharing and Stock Bonus Plans, Publication 778–2–72] which defines retirement plans as including only those plans where employer contributions are based upon the anticipated costs of retirement, thereby excluding plans such as Taft's "Profit Sharing Retirement Plan", in which contributions are based only upon profit.

A somewhat similar question was considered in Farid-Es-Sultaneh v. Commissioner of Internal Revenue, 2 Cir., 1947, 160 F.2d 812. The issue there was whether corporate stock received pursuant to an ante-nuptial contract was a "gift" such as would exempt it from income tax under a predecessor to I.R.C. § 102 of the 1954 Code. The taxpayer relied on a definition of "gift" taken from the gift tax section of the Internal Revenue Code which says that "gift" means a transfer without full and adequate consideration and that a transfer for release of marital rights is deemed to be without consideration. This definition, if applied to the income tax statute, would make it clear that the transfer in question was a "gift" and, therefore, not subject to income tax.

The Second Circuit, noting the different purposes of the income tax and gift tax statutes, expressly rejected taxpayer's contention that the definition in the gift tax statute should be applied to an income tax statute.

Though the present facts are not precisely similar to *Farid,* a similar logic applies. The IRS Bulletin and the Age Discrimination in Employment Act of 1967, as was true of the gift tax statute and income tax statute involved in *Farid,* have different purposes. The purpose of the Bulletin is to provide guidance for taxpayers in obtaining special tax treatment afforded by I.R.C. §§ 401–404. The purpose of the Act is to outlaw discrimination against older workers. There is no apparent relationship between what the IRS says for the purpose of taxpayer guidance and what Congress means when it passes a statute for the purpose of promoting employment of older workers.

A second argument can be made that Taft's "Plan" is not within the contemplation of the statutory exception when one considers the purpose of Congress when it enacted the Age Discrimination in Employment Act of 1967. In the course of committee hearings and floor debate, several Congressmen indicated the Congressional purpose to be protection of plans which in the absence of the (f)(2) exception would be too costly for the employer to maintain. For example, Representative Daniel said the purpose of the exception is to prevent "undue hardship on employers in providing special and costly benefits", 113 Cong.Rec. 34727.

Taft's costs are the same, regardless of whether or not it has employees over age 60. Moreover, to the extent Taft is able to attract better employees by providing more lucrative retirement plans, it is economically better off by hiring employees over 60, since those employees do not earn additional retirement benefits based upon age or length of service, thereby leaving more for other employees. Thus, the argument would be that Taft's mandatory retirement policy is not designed for the exempted and allowable purpose of holding down retirement costs.

■ There are several reasons which command the rejection of this approach.

The primary difficulty is that it attempts to use legislative history to *override* the unambiguous language of the statute. A similar argument was considered and rejected in Braunstein v. Commissioner, 374 U.S. 65, 83 S.Ct. 1663, 10 L.Ed.2d 757 (1963). This case concerned the interpretation of I.R.C. § 341 which says that the sale of stock in a statutorily defined "collapsible corporation" is not capital gain but ordinary income. The taxpayer conceded that the stock he had sold was stock in a "collapsible corporation" as defined by the statute. Nevertheless, he contended his gain should be treated as capital gain since his transactions were not ones which came within the Congressional purpose. That purpose was to "close a loophole through which some persons had been able to convert ordinary income into long term capital gain by use of the corporate form". The taxpayer's property was not property which would have produced ordinary income in the first place. He was therefore not using the corporate form to escape the higher tax rate and was not the type individual Section 341 was designed to include.

The Supreme Court rejected this elaborate argument, simply noting that his contention was "wholly inconsistent with the plain meaning of the statute". The Court further noted that looking to Congressional purpose would result in enormous practical difficulty. In each case, a court, rather than relying on the straightforward language of an unambiguous statute, would be forced to consider whether the use of the corporation was for tax avoidance on a "case by case" basis. Similarly, under our facts, a court, rather than relying on the straightforward language of the statute, is asked to determine on a case by case basis whether a particular plan is one which would be too costly to maintain in the absence of the statutory exemption. The practical difficulties of detailed court scrutiny of the costliness of retirement plans may well be as forbidding as court scrutiny of taxpayer purposes in establishing collapsible corporations.

In short, *Braunstein* gives two good reasons for rejecting the "Congressional purpose" argument. The Court thought it improper to consider Congressional purpose when the meaning of a statute is plain. And, the Court pointed to the practical difficulty of deciding, on a case by case basis, whether a given course of conduct is within the Congressional purpose.

A third and final reason for following the literal language of the statute, rather than its asserted purpose, is that statutory language should serve the function of indicating prohibited conduct. It is hardly reasonable to require persons affected by legislation to delve into voluminous and conflicting collections of speeches to determine whether what a statute plainly says is what it really means.

We are compelled to hold that the Secretary's argument falls short of negotiating the *"Highland Park-Braunstein"* hurdle and that, on its face, the Taft Broadcasting Plan of 1963 clearly falls, as an employee benefit plan, within the plain language which Congress chose to use when it enacted the exception.

The Secretary says that Taft's "Plan" was not bona fide—that to be bona fide the material provisions of an employee benefit plan must be communicated to them. Since Jones saw only a summary of the plan when he elected to participate in it, never a full copy, the "Plan" was not binding on him. We reject this argument, also.

Given its ordinary and commonly accepted meaning, the term bona fide is synonymous with "genuine" or "authentic", Webster's New Collegiate Dictionary, 1953. The stipulated facts show that Taft did have a plan, that it truly existed, and that Jones was paid approximately $15,000 as a result of it. It was both authentic and genuine. As we have already pointed out, regulations of other governmental departments or agencies, designed for other purposes, are not applicable to this case.

Does the Act require Taft to rehire Jones? That is, does the Act require employers to rehire former employees who have been retired under "bona fide employee benefit plans"?

The last clause in 29 U.S.C. § 623(f)(2) provides that "[no employee benefit plan] shall excuse the failure to hire any individual". Relying on the literal language of this section, the Secretary contends that the failure to hire "any individual" is illegal regardless of whether that individual has already been legally retired by the entity from whom he seeks the employment.

The Secretary's construction would render meaningless the statutory language allowing employers "to observe the terms of bona fide employee benefit plans such as retirement . . . plans". If retired employees must be rehired immediately, the right to insist on compliance with a plan is an illusion. Congress could not have possibly intended, or directed, such a contradictory, irreconcilable result. If Jones was validly retired, as we hold that he was, Taft was under no statutory duty to rehire him.

The Judgment of the District Court is Affirmed.

TUTTLE, Circuit Judge (dissenting):

With deference I dissent.

It is clear that the trial court dismissed the complaint of the Secretary of Labor brought on behalf of Mr. Jones only because the court construed section 623(f) and Taft Broadcasting Company's "profit sharing retirement plan" as depriving Jones of the benefits otherwise accorded to persons retired on account of age. Similarly, this Court's opinion affirmed on the same basis.

For the sake of the discussion in this dissenting opinion, I will assume that the Company's so-called "profit sharing retirement plan" would meet the description in the statute which authorizes an employer "to observe" its terms, provided the plan had ever gone into effect, so far as relates to the employee Jones. If it did not go into effect, then I would think that the majority would agree with me that it would not satisfy the requirements of section 623(f) which speaks of "the terms of a bona fide employee benefit plan." My difference from the view of the majority is twofold. In the first place I do not think the document which is called a retirement plan by the Company ever became a bona fide employment benefit plan as is contemplated in the statute, because its terms were never known by, nor agreed to by Jones who, as the court in its opinion says, "joined on the basis of a posted summary of the 'Plan' which stated only the following provision relating to retirement:

'The Normal retirement date of each Participant is the June 1 on which he has reached age 60. A Participant retiring from employment with the company on his normal retirement date is deemed retired under the Plan as of such date.' "

In the second place, I am of the opinion that were we to give full scope to the statutory provision authorizing Taft Broadcasting Company "to observe the terms of a bona fide benefit plan such as a retirement, pension, or insurance plan, . . ." this would not justify the Company to deprive an employee of rights otherwise accorded him under the Act unless the so-called plan expressly provided for compulsory termination at age sixty.

It is necessary to consider the precise facts of Mr. Jones's relationship with the Company in order to understand the reason for my disagreement with the Court's opinion. The facts are undisputed. Jones signed an election to participate in the "plan" on March 28, 1963, at which time neither he nor the union was able to obtain a complete copy of the text of the plan. As stated by the Court in its opinion here, Jones "joined on the basis of a posted summary of the 'plan' which stated only the following provision relating to retirement:

'The Normal retirement date of each Participant is the June 1 on which he has reached age 60. A Par-

ticipant retiring from his employment with the Company on his normal retirement is deemed retired under the plan as of such date.'"

The summary made no mention of any obligation on the part of an employee to retire on the "normal retirement date," either by precise terms or by implication. Moreover, the language just quoted appeared under a heading of the summary far over in the text under a heading entitled "Benefits upon Retirement under Plan."

Earlier sections of the rather lengthy "summary" are entitled as follows: "Effective Date", "Participating Divisions", "Eligibility for Membership", "Effect of Transfers Between Divisions of the Company", "Termination of Membership", "Contributions by Company", "Allocations to Participants' Accounts". Only under the last of these in subparagraph (c) is age sixty mentioned, and it is mentioned only in the following respect: "(c) One unit for each full month that such participant's age as of the end of such fiscal year exceeds age thirty-five but not age sixty, provided that no units shall be assigned for age under this clause to any participant who is over age sixty at the end of such fiscal year."

Under the title "Benefits Upon Retirement Under Plan" there are the following subheads: "Normal Retirement" (this is the one which is quoted above), "Early Retirement" (which makes provision for retirement after age fifty but prior to his normal retirement date), "Retirement from Military Service", "Retirement by Reason of Death", "Permanent Disability Retirement", "Determination of Amount of Benefit to Retired Employee", "Determination of Method of Distribution". Finally there is a further heading "Amendments".

From the foregoing, it will be seen that there was no section of the summary, nor, in fact, of the total contract, which was submitted to counsel for Mr. Jones for the first time after he had been notified that he was to be terminated on his sixtieth birthday, that pur-portedly deals with a mandatory retirement age. The provision on which the trial court, and this Court on appeal, based a conclusion that Jones had forfeited his rights to protection under the Act is the following section, which appears under the heading "Benefits Upon Retirement Under the Plan" and it appears immediately following the paragraph dealing with the normal retirement date quoted above. It provides:

"5.1[b] Later retirement. A participant, with the approval of the Company, may remain an employee after his normal retirement date. In such event, he shall be retired under the plan as of his later date of termination of employment."

Even here, there is no categorical statement that the "normal date of retirement" is the compulsory date absent an election by the employer to extend the time of employment. Without this language, of course there is nothing to warrant a construction of the document to mean "compulsory" date rather than "normal" date of retirement. The statement that the normal date of retirement is age sixty clearly implies that there are other dates within the minds of the parties.

This, then, brings us to the question of the existence of a bona fide plan of retirement which, as initially stated, can exist only if there is an agreement between the parties as to the contents of the plan. There is no dispute about the fact, and this Court has stated as a fact, that Jones joined on the basis of a posted summary of the plan which contained only the language dealing with the normal retirement date. We are not here concerned with the question whether Jones could succeed in an action to avoid the terms of the contract on the basis of misrepresentation or lack of mutual understanding or for any other cause; we are dealing only with the question whether a purported plan of the Company really becomes a "plan of retirement" when it is acquiesced in by the employee who is misled into thinking that there is no absolute requirement that he be retired at age sixty, because the language

essential to that requirement has been omitted from the summary posted by the Company for his guidance in determining whether to join the plan or not.

My first reason for disagreeing with the majority opinion, therefore, is that, so far as Jones is concerned, there never was a "plan of retirement", because he accepted the terms of the retirement plan presented to him, upon the urging of his employers, when the one operative provision that might have been detrimental to his interest was concealed from him.

My second ground for disagreement is that, even though Jones were to be held to have been fully bound by the purported plan, because of his application, even though he was misled as to its critical terms, the plan as fully spelled out still does not have the effect contended for it by the Company, or as found for it by the court. The language of the statute creating an exception, if, in fact, it really does create an exception, is not artfully worded. It says only that "it shall not be unlawful for an employer . . . to *observe* the terms of a bona fide . . . employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this chapter . . ." (Emphasis added). In addition to the fact that rules of construction require that this language, as an exception to the general provision of the Act, is subject to the narrow construction rule, the language itself falls short of saying "it shall not be unlawful for an employer to '*enforce*' or '*carry out*' the terms, etc." Moreover, there is a requirement on the party relying upon the exception established that it "plainly and unmistakably [falls] within [the] terms and spirit" of the legislation. Phillips Company v. Walling, 324 U.S. 490, 493, 65 S.Ct. 807, 808, 89 L.Ed. 1095 (1945).

In light of this requirement for a narrow construction of the statute, it would seem that at the very least, in order for a purported "plan of retirement" to be permitted to withdraw employees from the protection of the Act, such plan must state in categorical terms that its members are subject to compulsory retirement at a time or under conditions differing from those of the statute. As pointed out above, this purported plan falls far short of containing any such provision. It is completely without any categorical statement that no person shall work beyond age sixty, except upon the approval of management. Such inference as may be drawn to this effect is submerged in misleading divisions of the contract itself as, it seems to me, to make impossible a claim that this plan "plainly and unmistakably [falls] within [the] terms and spirit" of the exception.

I therefore respectfully dissent. At the very minimum I would remand the case to the trial court for it to determine whether any "bona fide plan" existed at all in light of the failure of disclosure of the critical facts to Jones. For my part I am satisfied that this Court should construe the documents in such manner as to conclude that the exception has not been met. I would therefore remand the case with directions that the judgment of dismissal be vacated and the case proceed for further hearing.