Sarah M. CIPRIANO and Jeune M. Miller, Plaintiffs-Appellants,

v.

BOARD OF EDUCATION OF the CITY SCHOOL DISTRICT OF the CITY OF NORTH TONAWANDA, NEW YORK, and North Tonawanda United Teachers, Defendants-Appellees.

No. 60, Docket 85–7366.

United States Court of Appeals, Second Circuit.

Submitted Oct. 16, 1985.

Decided March 4, 1986.

Brock, Brock & Zisser, Buffalo, N.Y. (David Gerald Jay, Buffalo, N.Y., of counsel), for plaintiffs-appellants.

James E. Rooney, North Tonawanda, N.Y., for defendant-appellee Bd. of Educ.

Bernard F. Ashe, Albany, N.Y. (Rocco A. Solimando, Ira Paul Rubtchinsky, Albany, N.Y., of counsel), for defendant-appellee Teachers Ass'n.

Alfred Miller, Steven S. Honigman, Peter N. Greenwald, New York City (Miller, Singer & Raives, Steven Zaleznick, Christopher G. Mackaronis, New York City, of counsel), for amicus American Ass'n of Retired Persons.

McGivern, Shaw & O'Connor, Albany, N.Y. (Henry F. Sobota, Albany, N.Y., of counsel), for amicus New York State School Boards Ass'n.

Before FRIENDLY, KAUFMAN and PRATT, Circuit Judges.

FRIENDLY, Circuit Judge:

This is an appeal from an order of the District Court for the Western District of New York granting summary judgment in favor of defendants in an action under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621–634, brought by two former teachers in the North Tonawanda City School System against the Board of Education of the City School District of the City of North Tonawanda, New York (the Board) and the North Tonawanda United Teachers (the Union). The complaint was directed at a provision of a collective bargaining agreement between the defendants effective July 1, 1980, through June 30, 1983 (sometimes hereafter "the incentive plan"), which offered retirement incentives[1] to members of the bargaining unit between the ages of 55 and 60 who retired effective between July 1 and February 1 in any of the three years of the agreement and had completed 20 years of service under the New York State Teachers Retirement System. These payments were in addition to the benefits otherwise payable upon early retirement. Unfortunately, because of the premature stage at which the decision below was rendered, the record does not include the terms of the underlying retirement plan in effect in the school system. We assume, based on the reference in the collective bargaining agreement and on statements in defendants' briefs, Brief for Appellee Board at 8; Brief for Appellee Union at 14, that the school system subscribed to the retirement plan in effect under the New York State Teachers' Retirement System (NYSTRS), N.Y.Educ. Law §§ 501–535 (McKinney 1969 & Supp. 1984).

Plaintiffs were 61 years old on July 1, 1980, and thus ineligible for the incentive plan by its terms.[2] They retired on June 30, 1981, when they were over 61 years old. On May 23, 1981, shortly before their retirement, contending that depriving them of the incentives because of their age violated the ADEA, plaintiffs filed complaints with the Equal Employment Opportunity Commission (EEOC), which is alleged to have sent a letter of violation to the defendants on April 27, 1982. Thereafter the EEOC attempted to conciliate plaintiffs' claim but commenced no formal action on plaintiffs' behalf. Plaintiffs then commenced this action on January 24, 1984, each claiming as damages the $10,000 she would have been entitled to receive under Option B if the incentive plan had applied to her at the time of her retirement, in addition to punitive damages based on the allegedly wilful nature of the violation, attorney's fees, costs, and other appropriate relief.

The Board filed an answer, containing ten "affirmative defenses." None of these was the provision in § 4(f)(2) of the ADEA, 29 U.S.C. § 623(f)(2), which was to become the basis for the decision below. The Union filed a motion to dismiss the complaint on various grounds, including that it failed to state a claim upon which relief can be granted, which the district court appears to have treated as having been filed on behalf of the Board as well. The asserted failure to state a claim was premised on § 4(f)(2), which provides that it shall not be unlawful for an employer, employment agency, or labor organization to

> observe the terms of a bona fide seniority system or any bona fide employee benefit plan such as a retirement, pen-

---

1. The incentives consisted of two options. Under Option A the Board would pay the cost of Blue Cross/Blue Shield and Major Medical Insurance until the retiree reached the age of 65 at the same level as was accorded to regular staff members, and also $2000 plus $50 for each complete year of service beyond 20 years. Under Option B the Board would pay a lump sum of $10,000.

2. The Board asserts that a "window" provision entitled plaintiffs to the incentives if they retired by June 30, 1980, and that the plaintiffs failed to take advantage of the window provision. The alleged "window provision" is not in the record, however, and we would not find it material to our decision if it were, since appellants' claim is not that they were denied the opportunity ever to participate in the incentive, but that they were denied the opportunity to do so on the date they ultimately chose to retire.

sion, or insurance plan, which is not a subterfuge to evade the purposes of this chapter, except that no such employee benefit plan shall excuse the failure to hire any individual, and no such seniority system or employee benefit plan shall require or permit the involuntary retirement of any individual specified by section 631(a) of this title because of the age of such individual[.]

After oral argument some months later the court entered an order stating that upon the present record the court was unable to grant the defendants' motion to dismiss and that it was unable to treat the motion as one for summary judgment, since the defendants had failed to provide the court with affidavits accompanied by a copy of the collective bargaining agreement. The order directed the defendants to file an affidavit to which such a copy was attached, with the averments restricted to the authenticity of the agreement; plaintiffs' response, if any, was to be similarly limited. The Union filed an affidavit apparently complying with the court's direction; the docket entries recite that plaintiffs filed an affidavit in opposition but this is not in the record before us.

After several months the judge rendered an opinion granting summary judgment in favor of the defendants in reliance on § 4(f)(2). Stressing the voluntary nature of the incentive plan, he found that the plan attacked by the plaintiffs was a bona fide retirement plan within § 4(f)(2) and that there was "nothing in this record to indicate that this plan is a subterfuge to evade the purposes of the act." After citing *Mason v. Lister*, 562 F.2d 343 (5 Cir. 1977), and *Patterson v. Independent School District # 709*, 742 F.2d 465 (8 Cir. 1984), he went on to say:

Congress meant to protect older individuals against forced discharge and barriers blocking employment opportunities when it enacted the ADEA. At the same time, Congress meant to preserve incentives for early voluntary retirement, recognizing that they are useful and necessary devices which employers can use to manage their work forces. The plan at issue here is consistent with both objectives.

No reference was made to our statement in *EEOC v. Home Insurance Company*, 672 F.2d 252, 257 (2 Cir.1982), that the burden of proving absence of subterfuge for the purposes of the § 4(f)(2) defense is on the defendants.

Plaintiffs appealed. Their initial brief, of six pages, was perfunctory. A more helpful brief in support of their position was filed by the American Association of Retired Persons as *amicus curiae*. Briefs were filed by the Board and the Union as appellees, and by the New York State School Boards Association as *amicus curiae* urging affirmance. The case was submitted without oral argument.

## DISCUSSION

Decision here is rendered difficult because of the peculiar posture in which the case comes to us. While the district court went through the form of converting the Union's Rule 12(b)(6) motion into one for summary judgment, the limitations which it imposed on the affidavits of both parties prevented them from having a "reasonable opportunity to present all material made pertinent to such a motion by Rule 56," as Rule 12(b)(6) requires. *Cf. Beacon Enterprises, Inc. v. Menzies*, 715 F.2d 757, 767 (2 Cir.1983). The practical effect was the same as if plaintiffs had amended their complaint to append the collective bargaining agreement and defendants had moved to dismiss the case under Rule 12(b)(6) for failure to state a claim upon which relief can be granted. For purposes of our discussion, we shall treat the case as if it had been decided in this way.

It is undisputed that, if it were not for § 4(f)(2), the incentive plan would run afoul of § 4(a)(1) of the ADEA, 29 U.S.C. § 623(a)(1), which makes it unlawful for an employer

to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privi-

leges of employment, because of such individual's age.

Appellants offer two principal arguments to explain why the incentive plan does not come within § 4(f)(2). They contend that defendants have failed to sustain the burden of showing that it was a "bona fide employee benefit plan such as a retirement, pension, or insurance plan" and that, if the first argument fails, defendants have failed to sustain the burden of showing that it was not a subterfuge to evade the purposes of the ADEA.

■ We see no merit in appellants' first contention. On its face the incentive plan is a "bona fide employee benefit plan" in the sense that employees benefited and substantial benefits were paid to employees who were covered by it, *see United Air Lines, Inc. v. McMann*, 434 U.S. 192, 194, 98 S.Ct. 444, 446, 54 L.Ed.2d 402 (1977); *EEOC v. Home Insurance Co., supra*, 672 F.2d at 257. Apart from the fact that the phrase "such as a retirement, pension, or insurance plan" provides illustrations rather than limitations, *Brennan v. Taft Broadcasting Co.*, 500 F.2d 212, 215 (5 Cir.1974); *Patterson v. Independent School District # 709, supra*, 742 F.2d at 466–67; *EEOC v. Westinghouse Electric Corp.*, 725 F.2d 211, 224 (3 Cir.1983), *cert. denied*, —— U.S. ——, 105 S.Ct. 92, 83 L.Ed.2d 38 (1984), we see no reason to doubt that the incentive plan, when read as a supplement to an underlying general retirement plan, was a "retirement" plan for the purposes of § 4(f)(2).

Appellants would limit the statutory language to plans in which age-based benefit reductions are justified by actuarially significant cost reductions, referring to the interpretation of § 4(f)(2) at 29 C.F.R. § 860.120(a)(1), issued by the Department of Labor shortly before its functions in enforcing the ADEA were transferred to the EEOC effective July 1, 1979.[3] The actual language of the interpretation reads in relevant part:

The legislative history of [§ 4(f)(2)] indicates that its purpose is to permit age-based reductions in employee benefit plans where such reductions are justified by significant cost considerations. Accordingly, section 4(f)(2) does not apply, for example, to paid vacations and uninsured paid sick leave, since reductions in these benefits would not be justified by significant cost considerations. Where employee benefit plans do meet the criteria in section 4(f)(2), benefit levels for older workers may be reduced to the extent necessary to achieve approximate equivalency in cost for older and younger workers. A benefit plan will be considered in compliance with the statute where the actual amount of payment made, or cost incurred, in behalf of an older worker is equal to that made or incurred in behalf of a younger worker, even though the older worker may thereby receive a lesser amount of benefits or insurance coverage. Since section 4(f)(2) is an exception from the general non-discrimination provisions of the Act, the burden is on the one seeking to invoke the exception to show that every element has been clearly and unmistakably met. The exception must be narrowly construed.

The language does not assist appellants. The interpretation says nothing to the effect that "cost considerations" must be actuarially based. The phrase "cost considerations" was used, as the interpretation states, to rule out from the scope of § 4(f)(2) plans that would curtail or reduce such benefits as "paid vacations and uninsured paid sick leave" for older workers, since reduction in these benefits would not be justified by significant cost considerations.

Significant cost considerations are often involved, however, in designing incentives for older employees voluntarily to leave the workforce because those who continue working beyond a certain age will often

---

**3.** The EEOC has not issued its own general interpretations governing the types of plans that fall within § 4(f)(2), but it has characterized those of the Department of Labor as "currently applicable," *see* 29 C.F.R. § 1625.10.

draw a salary that is significantly higher than the periodic payments obtainable under a pension plan. Since the employer's goal in offering early retirement incentives is often to save expenses by reducing the size of the workforce, it is only reasonable for the employer to offer more to those employees who choose to leave at a younger age, saving the employer more years of continued full salary, than to those who remain in the workforce and do not confer on the employer the sought-after benefit. *Cf. Britt v. E.I. DuPont de Nemours & Co.*, 768 F.2d 593 (4 Cir.1985) (no ADEA violation by employer in conditioning eligibility for payments under voluntary reduction in force program on willingness to defer pension benefits; plaintiffs not entitled "both to retirement benefits *and* the wage substitute of severance pay"). An additional incentive for early retirement is generally no more repugnant to the purpose of § 4(f)(2), which is in part to permit employers to offer compensation to older workers who choose to exit the workforce, than any more traditional retirement plan contemplated by that section. For the purpose of determining whether a plan is a "bona fide employee benefit plan" within the meaning of § 4(f)(2), it is immaterial that a more nicely tailored plan would have provided in Option B for a bonus starting at higher than $10,000 and gradually tapering off, with perhaps some small amounts continuing beyond 60. The way the plan is structured affects only whether it might be a subterfuge to evade the purposes of the Act, not whether it qualifies generically for the shelter of § 4(f)(2).

Appellants seek to buttress their argument with three decisions of other circuits. *Alford v. City of Lubbock*, 664 F.2d 1263 (5 Cir.), *cert. denied*, 456 U.S. 975, 102 S.Ct. 2239, 72 L.Ed.2d 848 (1982); *EEOC v. Westinghouse Electric Corp., supra*, 725 F.2d 211; and *EEOC v. Borden's Inc.*, 724 F.2d 1390 (9 Cir.1984). Each of these cases is distinguishable, however, because the fringe benefits that were tied by the employer to the retirement plans could in no way be considered to be functionally related to those plans, as is the case with the incentive plan here.

In *Alford*, the defendant city had a retirement policy that required employees to retire at the age of 65,[4] and that made employees eligible for retirement benefits only if they had been employed for 15 years or more. Accordingly, in order to save administrative costs from needlessly collecting and refunding plan contributions to ineligible employees, no employee hired after his fiftieth birthday would be allowed to participate in the retirement plan. The city also had a policy, however, of paying all employees who retired under the plan for accumulated but unused sick leave up to a total of 90 days. Two employees who had been ineligible for the retirement plan but were forced to retire at age 65 brought suit claiming that they were impermissibly discriminated against by virtue of being denied retirement benefits altogether and also because they were denied the accumulated sick leave pay afforded other employees who were eligible for the retirement plan. The court upheld the provision denying retirement benefits to employees hired after their fiftieth birthdays as a legitimate age-related-cost-justified restriction, entirely in accord with congressional intent in enacting § 4(f)(2), 664 F.2d at 1269–71, but struck down the denial of the sick-leave benefits to the plaintiffs because this was not the type of plan entitled to protection under § 4(f)(2) and because the sick-leave policy formed no part of the pension plan, *id.* at 1271–72. Although eligibility for the accrued sick pay was *conditioned on* eligibility for retirement benefits, this was insufficient to shield the sick-pay policy because the condition was "functionally irrelevant to any 'retirement, pension, or insurance plan,'" *id.* at 1272, and thus was indistinguishable from any other fringe benefit that might be offered to employees but would fall outside § 4(f)(2).

---

**4.** The *Alford* case was not governed by the 1978 amendments, later discussed, which raised the age at which retirement could be compelled

from 65 to 70 and limited § 4(f)(2) to voluntary retirement plans.

*Alford* is inapposite to this case because the North Tonawanda incentive plan was functionally related to the underlying retirement plan. There is nothing inconsistent with the ADEA in offering older employees compensation for leaving the workforce, as is plain from the fact that retirement plans are included within the protection of § 4(f)(2). Because the special incentive simply increases that compensation and, like benefits available under the underlying retirement plan, is a quid pro quo for leaving the workforce after a certain age and number of years of service, it must be viewed functionally as part of that plan. *Cf. EEOC v. Fox Point-Bayside School District*, 772 F.2d 1294, 1301 (7 Cir.1985) (rejecting EEOC's argument that provision in collective bargaining agreement was not part of a statutory retirement plan for the purposes of § 4(f)(2) simply because the terms were not incorporated into one document). By providing an enhanced inducement for employees to retire early, the incentive plan furthers the legitimate purpose behind such a plan. The sick-pay policy in *Alford*, however, had nothing to do with retirement itself, but was a reward for past conduct—staying healthy and on the job—which was equally valuable to the employer regardless of the employee's age or length of service. Age, or retirement eligibility, was completely unrelated to the purpose of the challenged benefit.

*Westinghouse* and *Borden's* are inapposite for reasons similar to *Alford*. In *Westinghouse*, the provision under attack was a provision in a layoff benefit plan (LIB Plan) in effect at plants that were being closed by the employer, under which benefits were denied to those laid-off employees who were eligible for early retirement. The court concluded that there was

> no age-related cost factor on the face of the LIB Plan which justifie[d] Westinghouse's actions.... [T]he fact that the LIB Plan [was] tied to Westinghouse's Pension Plan [did] not negate the fact that it [was] more analogous to a 'fringe benefit' than to the types of employee benefit plans covered under [§]4(f)(2).

725 F.2d 224–25. The only reason for distinguishing between younger employees and those who were denied the benefits was that the latter had early retirement benefits as an option to fall back on in the absence of the layoff benefits, whereas the younger employees would have had nothing. But, as in *Alford*, "[t]he LIB Plan, ... [was] functionally independent of the Pension Plan," and "[t]he mere fact that the benefits available to employees under the Pension Plan were to be considered when determining eligibility for LIB ... [did] not merge the two plans into a single 'coordinated benefit plan'" for the purposes of § 4(f)(2). *Id.* at 225. *Borden's* is distinguishable on the same grounds. It involved a severance pay plan for the closing of a plant under which employees eligible for early retirement were ineligible for the severance pay. The court found that this "one-time, ad hoc cash payment" was simply unrelated to the kind of "on-going benefit schemes" that were intended to be protected under § 4(f)(2). 724 F.2d at 1396.

More nearly apposite is one of the cases cited by the district court, *Patterson v. Independent School District # 709, supra,* 742 F.2d 465. There the Eighth Circuit upheld a special early retirement incentive bonus, in conjunction with a retirement plan which had a normal retirement age of 65, under which a teacher could receive a lump-sum payment of $10,000 for choosing to retire at age 55, diminished by $500 for each year over 55 until age 60, and by $1500 for each year over 60. This had the result that teachers who retired over 65, including the 67-year-old plaintiff, received nothing under the incentive. The court had little trouble in finding that the plan was of a type that "qualifies for approval under § [4](f)(2)." It found that in order to overcome the incentive for teachers to continue to work until normal retirement age, the plan "would furnish an incentive for teachers to trigger or activate the general pension plan at an earlier age, by holding out the 'carrot' of 'an early retirement incentive ...' if eligible for ... retirement at 55." *Id.* at 467–68.

We reach a different conclusion with respect to appellants' alternative argument, that defendants did not bear their burden of showing that the incentive plan was "not a subterfuge to evade the purposes of" the ADEA sufficiently to justify dismissal of the complaint without a trial. Here some history is in order.

As originally enacted, § 4(2)(f) did not contain what is now the final clause:

and no such seniority system or employee benefit plan shall require or permit the involuntary retirement of any individual specified by section 631(a) of this title because of the age of such individual.

In *United Air Lines, Inc. v. McMann*, 434 U.S. 192, 98 S.Ct. 444, 54 L.Ed.2d 402 (1977), the Court, dealing with a plan long antedating the ADEA, held that the section, as it then stood, permitted plans compelling retirements before the age of 65 unless the plan was a subterfuge to evade the purposes of the Act.[5] The Court, speaking through the Chief Justice, gave the subterfuge phrase a quite restrictive meaning. It said, 434 U.S. at 203, 98 S.Ct. at 450, that:

In ordinary parlance, and in dictionary definitions as well, a subterfuge is a scheme, plan, stratagem, or artifice of evasion. In the context of this statute, "subterfuge" must be given its ordinary meaning and we must assume Congress intended it in that sense. So read, a plan established in 1941, if bona fide, as is conceded here, cannot be a subterfuge to evade an Act passed 26 years later. To spell out an intent in 1941 to evade a statutory requirement not enacted until 1967 attributes, at the very least, a remarkable prescience to the employer.

We reject any such *per se* rule requiring an employer to show an economic or business purpose in order to satisfy the subterfuge language of the Act.[6]

The Court did not determine who had the burden of proof on the question whether the plan was not a subterfuge in cases in which the plan post-dated the passage of the Act.

We dealt with that question in *EEOC v. Home Insurance Company*, 672 F.2d 252 (1982). This concerned a 1974 amendment to Home's retirement plan which lowered both the normal retirement age[7] and the mandatory retirement age from 65 to 62. The EEOC's attack was leveled at the lowering of the mandatory retirement age, which it contended to have been a subterfuge to evade the purposes of the ADEA.

This court, speaking through Judge Kearse, began its discussion by holding that an employer relying on § 4(f)(2) had the burden of establishing the three elements of that defense, namely

(1) there must be a bona fide (retirement) plan, (2) the action must have been taken in observance of its terms, and (3) the retirement plan must not have been a subterfuge to evade the purposes of the ADEA.

672 F.2d at 257. It then held that the mere fact that a plan is bona fide in the sense that it paid substantial retirement benefits does not establish that it is not a subterfuge, *id.* at 260, a conclusion which the statutory language makes rather clear. The opinion said of *McMann:*

The ruling in *McMann* does not purport to relieve all employers of all obligation

---

**5.** The "subterfuge" language had appeared in the version of § 4(f)(2) contained in the original administration bill, which provided:

It shall not be unlawful for an employer … to separate involuntarily an employee under a retirement policy or system where such policy or system is not merely a subterfuge to evade the purposes of this Act....

S. 830, 90th Cong., 1st Sess. § 4(f)(2), 113 Cong. Rec. 2794 (1967); *see McMann,* 434 U.S. at 199 n. 6, 98 S.Ct. at 448 n. 6.

**6.** Justice Stewart, concurring, would have placed decision of the "subterfuge" issue solely on the ground that the plan long antedated the Act, 434 U.S. at 204, 98 S.Ct. at 450; Justice White, concurring, thought that this consideration deserved no weight, *id.* at 204–05, 98 S.Ct. at 450–51; Justices Marshall and Brennan dissented in an opinion by the former, *id.* at 208, 98 S.Ct. at 453.

**7.** This means the age at which an employee can retire and receive full pension benefits without actuarial reduction.

to prove economic or business purposes in order to disprove subterfuge. Rather, the thrust of *McMann* is that where the plan is bona fide, in that it pays substantial benefits, and where the action taken is in observance of its terms, the employer can meet its burden of proving that the plan is not a subterfuge simply by showing that it was established long before the ADEA was enacted. Where, however, the pertinent terms of the plan were adopted after the ADEA was enacted, this avenue of disproving subterfuge is simply not open. Proof by the employer of non-age-based reasons will then be required.

*Id.* at 258–59. The court concluded that *Home* had not established sufficient "valid business reasons" for lowering the mandatory retirement age to have justified the grant of summary judgment in its favor.

*Home* would clearly require reversal here, where the defendants submitted nothing to satisfy their burden, were it not for the fact that the incentive plan here at issue, conformably with the 1978 amendment, did not compel plaintiffs to take early retirement. It can be argued with some force that this distinction renders *Home* inapplicable. As Judge Kearse said, 672 F.2d at 261, "Forcing an employee to retire at a given age is hardly the same as merely permitting him to do so. Only the forced retirements are under attack." Moreover, the subterfuge provision came into the ADEA in a portion of the administration bill which dealt solely with compulsory retirement, *see* note 5 *supra.* Finally, it is rather hard to give content to the concept of "subterfuge" when that term is applied to a plan for voluntary action, there is no claim that the option was illusory, and the complaint is made, not by employees who claim that they were tricked by the option into prematurely leaving the workforce, but rather by employees who protest at having been excluded from the option. Beyond this, 29 C.F.R. § 1625.9(f) of the interpretive regulations issued by the EEOC, to which enforcement of the ADEA was transferred from the Department of Labor in 1979, provides in part:

Neither section 4(f)(2) nor any other provision of the Act makes it unlawful for a plan to permit individuals to elect early retirement at a specified age at their own option.

■ Without further guidance from the EEOC, however, we hesitate to go so far as practically to read the subterfuge clause out of the statute in regard to voluntary early retirement plans, as the district court did. When Congress amended the ADEA in 1978 to ban mandatory retirement plans of the sort at issue in *McMann* and *Home*, it left the subterfuge language in the statute; the statute still requires the employer to show something more than that the plan was a bona fide plan. Although 29 C.F.R. § 1625.9(f) approves of early retirement plans generally, its focus seems to have been on the traditional plan under which an employee can retire early for a significantly reduced pension, and it does not necessarily go so far as to approve of all early retirement plans, regardless of how their incentives may be structured. Most important of all are the regulations promulgated by the Department of Labor on May 25, 1979, contained at 29 C.F.R. § 860.120, interpreting § 4(f)(2), which are still held to be applicable pending the EEOC's promulgation of its own regulations, *see* 29 C.F.R. § 1625.10. These regulations, enacted *after* the 1978 amendments went into effect, clearly assume that the "subterfuge" requirement has continued vitality, and seem to put a fairly heavy burden on the employer to justify any age-based distinctions in employee benefit plans on the basis of "age-related cost justifications." While we would not wish to be understood as endorsing every detail of the regulations, we cannot simply disregard them. All that we now decide is that even in the case of voluntary early retirement plans the employer—and also here the union—must come up with some evidence that the plan is not a subterfuge to evade the purposes of the ADEA by showing a legitimate business reason for structuring the plan as it did.

The authorities cited by the district court are not to the contrary. In *Patterson v. Independent School District # 709, supra,* 742 F.2d at 466, apart from the more carefully tailored nature of the plan which we have described above, plaintiff did not contend that defendants' action constituted a subterfuge. *Mason v. Lister, supra,* 562 F.2d 343, involved an attack on a voluntary retirement plan linked to a major reduction in force at a federal agency, § 5 U.S.C. § 8336(d)(2). The attack was by a worker who had not yet attained the floor for access to the early retirement option, and such a floor is inherent in any age-based retirement plan within the purview of § 4(f)(2).

■ We would not wish our decision here to be read as a disapproval of voluntary early retirement plans in general or of this plan in particular. The evidence of business reasons required to show that a voluntary early retirement plan is not a subterfuge would almost necessarily be less than what was required to make such a showing in the case of a mandatory plan. Here the older worker is not being deprived of continuation at his job or of pension benefits. He is being deprived only of the same opportunity to receive a bonus for early retirement as is accorded workers in the age bracket just below him. We decline to speculate on the precise contours of that showing in light of the extremely scant record before us and without initial consideration by the district court. On the remand we are directing, the district court should seek the assistance of the EEOC, whether as an intervenor or *amicus curiae;* perhaps before the case is heard, that agency, after the lapse of seven years, may have issued its own guidelines with respect to the meaning of subterfuge as applied to the ADEA as amended in 1978, or with respect to the permissible means of structuring voluntary retirement plans. *See EEOC Issues First Opinion Letter Since Taking Over Program in 1979,* [Jan.-June] Pens.Rep. (BNA) No. 1, at 3 (Jan. 2, 1984) (EEOC source indicates agency shortly intends to address "question of the legality of early retirement incentive programs.").

The summary judgment dismissing the complaint is reversed and the cause is remanded for further proceedings consistent with this opinion.